JOHN PAUL MITCHELL SYSTEMS and Ultimate Salon Services, Inc., Appellants,

v.

RANDALLS FOOD MARKETS, INC. and Jade Drug Company, Inc., Appellees.

No. 03–99–00071–CV.

Court of Appeals of Texas, Austin.

March 30, 2000.

Rehearing Overruled June 15, 2000.

Shannon H. Ratliff, McGinnis, Lochridge & Kilgore, L.L.P., Austin, for appellants.

William F. Harmeyer, William F. Harmeyer, Houston, for Jade.

Marie R. Yeates, Vinson & Elkins, L.L.P., Houston, for Randalls.

Before Chief Justice ABOUSSIE, Justices B.A. SMITH and YEAKEL.

BEA ANN SMITH, Justice.

This suit is one of many that John Paul Mitchell Systems (Paul Mitchell) has brought attempting to stop diversion of Paul Mitchell hair products to unauthorized retail outlets. Joined by one of its exclusive distributors, Ultimate Salon Services, Inc., Paul Mitchell sued Randalls Food Markets, Inc. for selling Paul Mitchell products, which are intended to be sold only through its exclusive distribution system. Jade Drug Company, Inc. intervened to defend and indemnify Randalls.

Paul Mitchell sought injunctive relief and damages, alleging breach of contract, tortious interference with contract, conspiracy, unfair competition, trademark infringement, and conversion. All theories of recovery except conversion were submitted to the jury, which awarded the plaintiffs $6,250,000 in actual damages and $9,000,000 in punitive damages. However, the trial court granted the defendants' motion for judgment notwithstanding the verdict and rendered a take-nothing judgment that denied all relief. Paul Mitchell and Ultimate Salon appeal the trial court's judgment *non obstante veredicto*, claiming there is ample evidence to support the jury's findings. They further appeal the trial court's ruling that Jade's list of suppliers is protected from discovery as a trade·secret and the court's failure to submit certain additional theories of recovery to the jury. The appellees bring cross-points urging that even if there is more than a scintilla of evidence to support the jury's findings, the evidence is factually insufficient. We will affirm the trial court's judgment.

## THE DISPUTE

### Diversion of Products

Paul Mitchell markets its hair care products exclusively to authorized distributors and salons; Ultimate Salon is one of these authorized distributors. Jade is not. Jade sells many brands of professional hair products to retail outlets. Randalls is a retail grocery store chain in Texas that has sold Paul Mitchell products for several years. Jade is the sole supplier of Paul Mitchell products to Randalls.

Paul Mitchell is one of many manufacturers that wants its hair care products sold only by salons. Paul Mitchell's thirty-three authorized distributors agree to sell its products only to those in the professional beauty·industry and not to retail outlets. The 53,000 authorized salons agree to use the Paul Mitchell products in the salon or sell them directly to customers. Paul Mitchell emphasizes that this closed distribution chain enables it to mon-

itor the quality of its products and provide professional advice as to their proper use. More importantly, this exclusive marketing enhances the reputation and desirability of Paul Mitchell products and promotes sales with a higher profit margin.

To monitor quality, Paul Mitchell imprints a batch code on each bottle that permits defective products to be tracked. A second ultraviolet code that identifies distributors assists Paul Mitchell in tracing leaks in its closed distribution system. The diversion of products to mass retail outlets diminishes the upscale reputation of Paul Mitchell to salons and their clientele.

Paul Mitchell has attempted to stop the diversion of products from its closed distribution chain both by suing those who supply products to retail outlets and by suing the retail outlets themselves. In this instance, Paul Mitchell first sued Jade, seeking to prevent its unauthorized acquisition and sale of Paul Mitchell products. After reaching a settlement with Jade that Paul Mitchell thought prevented its future sale of any Paul Mitchell products, Paul Mitchell dismissed that lawsuit and sued Randalls. Jade intervened in the second lawsuit because it had agreed to defend and indemnify Randalls in the event of such a dispute.

**Jade Lawsuit**

To protect its exclusive distribution system in Texas, Paul Mitchell first filed suit against Jade in January 1996, complaining that Jade had acquired Paul Mitchell products, removed the batch codes, and sold products to various retail outlets. That dispute was resolved by a settlement agreement dated November 3, 1997, made effective when the lawsuit was dismissed on December 5, 1997. Paul Mitchell's breach of contract claim in this lawsuit alleges that Jade breached the terms of that settlement agreement.

**Randalls Lawsuit**

As soon as it settled its first lawsuit against Jade, Paul Mitchell filed this cause of action against Randalls in November 1997. Although the original petition asserted claims only against Randalls, after Jade intervened to honor its indemnity agreement, Paul Mitchell amended its lawsuit to include Jade as a co-defendant. Paul Mitchell and Ultimate Salon alleged that the co-defendants were selling hair products from which batch codes and other identification had been removed or defaced and that this conduct violated a penal statute and constituted unfair competition and trademark infringement. They further complained that Randalls and Jade conspired to tortiously interfere with Paul Mitchell's exclusive distribution contracts and that injunctive relief was necessary to prevent dilution of Paul Mitchell's trademarks and reputation. Finally, Paul Mitchell added a breach of contract claim against Jade, complaining that it had violated the terms of the recently signed settlement agreement. The suit against Randalls and Jade was tried to a jury in August 1998. By a ten to two vote, the jury answered all questions favorably to Paul Mitchell and Ultimate Salon, finding that: (1) Jade had breached its settlement agreement with Paul Mitchell; (2) Jade had tortiously interfered with exclusive distribution contracts between Paul Mitchell or Ultimate Salon and their distributors or salons; (3) Jade and Randalls were guilty of conspiring to interfere with Paul Mitchell's exclusive contracts with distributors or salons, and both acted with malice in their conduct toward Paul Mitchell and Ultimate Salon; (4) Jade and Randalls competed unfairly with Paul Mitchell, infringed on its trademark, and diminished its reputation or diluted the value of its trademark; and (5) the defendants' conduct was likely to cause irreparable harm to Paul Mitchell or Ultimate Salon. The jury found that the plaintiffs were entitled to damages exceeding $15 million and the injunctive relief requested. The trial court was presented with the plaintiffs' motion to render judgment on the verdict, the defendants' motion to require an election of remedies to prevent a double recovery,

and the defendants' motion to disregard the jury findings and render judgment notwithstanding the verdict. After extensive post-judgment briefing and a lengthy hearing, the trial court granted the defendants' motions to disregard the jury findings and rendered a take-nothing judgment that denied all relief.

### Issues on Appeal

Paul Mitchell and Ultimate Salon insist on appeal that there is sufficient evidence to support the jury's findings and rendition of judgment in their favor. In the alternative, if we do not render judgment on the verdict, appellants seek a remand of the cause for a new trial on two grounds. First, they urge that the trial court erred in protecting the list of Jade's suppliers as a trade secret and this entitles them to a new trial. Second, they urge that the trial court erred in not submitting some of their theories of recovery to the jury.

Randalls and Jade assert in cross-points that if we hold that there is more than a scintilla of evidence to support the jury's findings, the evidence is factually insufficient to support the verdict and requires a remand to the trial court for a new trial. Randalls also complains of excessive damages and unfounded damages against it on several grounds and suggests a remittitur. We will first review the evidence in support of the jury's verdict and address the other issues only as needed.

### JUDGMENT NOTWITHSTANDING THE VERDICT

■■■ In their first issue on appeal, appellants contend that the trial court erred in granting a judgment notwithstanding the verdict because there is sufficient evidence to support the jury's findings. They ask this Court to reverse and render judgment granting the actual damages, exemplary damages, and injunctive relief awarded by the jury. We will uphold a trial court's judgment notwithstanding the verdict only if we determine that there is no evidence to support the jury's findings. *See Mancorp, Inc. v. Culpepper,*

802 S.W.2d 226, 227 (Tex.1990). We review the record in the light most favorable to the jury's findings, considering only the evidence that supports the findings. *See id.* If there is more than a scintilla of evidence supporting the findings, we must reverse the judgment *non obstante veredicto. See id.* at 228. We will first review the findings related to damages according to the theories of recovery urged. Then we will review the findings that would invoke the court's equitable powers to grant injunctive relief.

## I. DAMAGES

### A. Breach of Contract

■■■ This cause of action was asserted only against Jade, and it concerns the terms of the settlement agreement that led to the dismissal of Paul Mitchell's earlier lawsuit against Jade. The terms that Jade allegedly breached are the following:

1. Jade agrees that it will not knowingly (defined as intentionally, deliberately or willfully) purchase, acquire, sell, resell, distribute, consign or ship in any manner any Paul Mitchell products whose batch codes have been removed, defaced, covered, altered, destroyed, obliterated, replaced or tampered with in any manner or whose packaging or other codes have been otherwise tampered with in any manner that is prohibited by law.

2. Jade agrees that it will not, at any time in the future: a) remove, deface, cover, alter or destroy batch codes on any Paul Mitchell products; b) remove, deface, cover, alter or tamper with the packaging of Paul Mitchell products in anyway or manner prohibited by law; and c) request or direct that any other third party or entity to commit the acts described in either a) or b) above.

■■■ Although the alleged breach concerned only this settlement agreement, there are innuendos in the evidence that

Jade's actions in buying or selling Paul Mitchell products breached the exclusive distribution obligations imposed by Paul Mitchell's closed distribution system. We wish to make clear at the start that Jade, who is not an exclusive distributor, could not be found liable for breaching the obligations Paul Mitchell imposed on its distributors and salons. Someone in that closed distribution system violated its contractual obligations to Paul Mitchell by selling to Jade, but Jade cannot be liable to Paul Mitchell for that contractual breach.

We have carefully reviewed all the evidence that appellants rely on as supporting the jury's finding that Jade breached its obligations under the settlement agreement. Primarily, appellants point to the testimony of Jade's president, Harold Wallace, and its CEO, Victor Jansen. On direct and on cross-examination, Wallace and Jansen were asked if Jade removed batch codes. They both answered no. They testified that they do not remove batch codes and that they do not take any codes off. Jansen further testified that Jade has not knowingly, intentionally, or deliberately dealt in any products with a defaced batch code. Counsel for Paul Mitchell then stated that they *must* have broken their agreement because they continued to sell Paul Mitchell products after signing the agreement. Jansen replied that it was his understanding that Jade could still sell Paul Mitchell products after the agreement, so long as they did not deface or alter codes or knowingly buy or sell products that had defaced codes. We agree that the plain language of the settlement agreement did not prohibit Jade from selling Paul Mitchell products.

This confusion about which obligation was breached continues during the questioning of Harold Wallace. "If you were selling Paul Mitchell products," he is asked, "then the products must have been stolen, counterfeit or *someone in the closed distribution system must have breached that agreement.*" The fact that

Jade was selling Paul Mitchell products was some evidence that some distributor was breaching its exclusive agreement with Paul Mitchell, but it was no evidence that Jade had defaced codes or sold products whose codes had been altered.

More particularly, there is a timing problem. If Jade altered codes or acquired and sold products with altered codes *before* the effective date of the settlement, that would not establish a breach of the settlement agreement. The conduct would have to occur *after* December 5, 1997 to constitute a breach. Paul Mitchell recovered some bottles of product with altered codes from Randalls, and Jade is the only company who supplied the product to Randalls. But there is no testimony that establishes *when* Jade sold Randalls the Paul Mitchell products with altered codes. There is no evidence that Jade did anything after the agreement besides sell Paul Mitchell products to Randalls. In and of itself, that is evidence that someone in the closed distribution system breached its contract with Paul Mitchell by selling its product to Jade, but it is no evidence that Jade breached either of the two specified terms in the settlement agreement. We reject Paul Mitchell's suggestion that the jury was free to infer that if there was any product with an altered code on the shelves of Randalls, it must have been sold by Jade after the settlement agreement became effective. There was testimony that the shelf-life of Paul Mitchell products is five to six years. It is thus not reasonable to infer that any altered product found on Randalls's shelf after December 1997 had been placed there in violation of the settlement agreement.

At trial, there was an attempt to persuade the jury that by buying and selling Paul Mitchell products after December 1997, Jade somehow breached its contract with Paul Mitchell. This "suggestion" was successful; the jury held that Jade had breached its contract. But Jade did not have a distribution contract with Paul Mitchell. The only contract at issue in

this lawsuit was the settlement agreement in which Jade agreed not to alter codes or acquire and sell products with altered codes after December 5, 1997. Because there is no evidence that it breached its agreement after that date[1] and no evidence that it knowingly breached its agreement, the trial court correctly granted Jade's motion to disregard the jury's findings and enter judgment that appellants take nothing on their breach of contract claim.

## B. Conspiracy and Tortious Interference with Contract

The jury found that Jade tortiously interfered with contracts between Paul Mitchell or Ultimate Salon and their distributors and salons. It found that Randalls conspired with Jade in interfering with these distribution contracts. It further found both Jade and Randalls acted with malice in causing harm to appellants.

■■■ To recover for tortious interference with a contract Paul Mitchell and Ultimate Salon had to prove: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) the act was a proximate cause of their damages; and (4) actual damages or loss. *See ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex. 1997); *Texas Beef Cattle Co. v. Green,* 921 S.W.2d 203, 210 (Tex.1996). Paul Mitchell alleges that the contracts at issue are all the exclusive distribution contracts it has with its distributors and salons. Paul Mitchell's theory is that Jade, as an unauthorized distributor, undermined Paul Mitchell's exclusive distribution system, in effect interfering with the many contracts that make up that closed system. Jade complains that Paul Mitchell has not identified any specific contracts with which Jade interfered. Paul Mitchell responds that it was unable to identify the salon or distributor that broke its contract because

Jade would not disclose its suppliers and the trial court erroneously protected Jade's list as a trade secret.[2] We hold that Paul Mitchell has satisfactorily identified the exclusive distribution system that it alleges was breached.

■■■ Our discussion focuses on whether there is some evidence of a willful and intentional act of interference by Jade. Paul Mitchell argues that there is evidence that Jade purchased Paul Mitchell products with knowledge of the closed distribution system and "with a belief that interference was substantially certain to result." *Southwestern Bell Tel. Co. v. John Carlo Tex., Inc.,* 843 S.W.2d 470, 472 (Tex. 1992). Paul Mitchell does not point to any place in the record where the evidence establishes Jade's belief that by purchasing Paul Mitchell products from its brokers, it intended to interfere with Paul Mitchell's distribution contracts. The best evidence we have located is the testimony of Harold Wallace, Jade's president. He acknowledged that he was generally aware of Paul Mitchell's restricted distribution system and that Jade was not an authorized dealer. Wallace was asked if the only way Jade could get Paul Mitchell products was if somebody broke their contract. He responded, "I would assume if that contract is as you say it is, somebody broke their agreement."

At issue is whether this constitutes some evidence of Jade's "willful and intentional act of interference." Texas courts have held that to satisfy this element of the cause of action for tortious interference, a party must be more than a willing participant; it must knowingly induce one of the contracting parties to breach its obligations. *See Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 927 (Tex.1993). In *Browning–Ferris, Inc. v. Reyna,* the supreme court held that a willful act involves more than participation with a breaching party:

---

1. Nor is there any evidence of damages limited to a period after December 5, 1997.

2. We will address this alleged error later in this opinion.

[T]his testimony implies that BFI may have been a willing participant; it does not establish that BFI ... was engaged in any improper conduct. Standing alone, it does not show that this contact involved "knowing inducement" or other intentional interference by BFI as required to establish a cause of action in Texas for tortious interference.

865 S.W.2d at 927 (finding no evidence of an essential element of tortious interference with contract).

In *Davis v. HydPro, Inc.*, 839 S.W.2d 137 (Tex.App.—Eastland 1992, writ denied), the court of appeals reversed a jury verdict awarding damages for tortious interference with contractual relations on similar grounds:

A necessary element of the plaintiff's cause of action is a showing that the defendant *took an active part in persuading a party to a contract to breach it*. Merely entering into a contract with a party with the knowledge of that party's contractual obligations to someone else is not the same as inducing a breach. It is necessary that there be some act of interference or of persuading a party to breach, for example by offering better terms or other incentives, for tort liability to arise.

*Id.* at 139 (internal quotations omitted) (quoting *Texaco, Inc. v. Pennzoil Co.*, 729 S.W.2d 768, 803 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.), *cert. dism'd*, 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988)); *see also Arabesque Studios, Inc. v. Academy of Fine Arts Int'l, Inc.*, 529 S.W.2d 564, 568 (Tex.Civ.App.—Dallas 1975, no writ) (plaintiff must show that defendant caused interference; it is not enough that defendant reaped advantage of contract broken by breaching party's own volition).

Other states have expressed the same need for some evidence of "knowing inducement." In a case involving this same product, a federal court in New York dismissed Paul Mitchell's claim for tortious interference with its distribution contracts:

As the defendants point out, the plaintiffs' contention, when stripped of its conjectural allegations ... is that the defendants should be held liable for tortious inducement because they purchased Paul Mitchell Products while knowing that such products would not have been obtainable unless, presumably, someone along the [Paul Mitchell] distribution network had breached his, her or its contract with [Paul Mitchell].... [T]he plaintiff's claim fails to show "inducement" of the alleged breach.

*John Paul Mitchell Sys. v. Pete–N–Larry's, Inc.*, 862 F.Supp. 1020, 1029 (W.D.N.Y.1994) (citing Restatement (Second) of Torts § 766 cmt. n (1979) for the proposition that mere making of agreement by third party with knowledge of inevitable breach of contract by other party does not constitute actionable inducement); *see also Texaco*, 729 S.W.2d at 803 (considering tortious interference with contract under New York law).

Here, although there is evidence that Jade purchased products when it knew of Paul Mitchell's closed distribution system, there is no evidence that Jade "induced" anyone to breach its exclusive distribution agreement with Paul Mitchell. It is not even known whether Jade's suppliers were authorized or unauthorized dealers or salons. If its brokers were not authorized dealers, there could be no tortious interference. If one of Paul Mitchell's dealers or salons breached its obligations of its own volition, and Jade merely participated in the transaction, this does not constitute the "knowing inducement" required under Texas law to impose liability for tortious interference with Paul Mitchell's distribution network. *See Davis*, 839 S.W.2d at 140; *Browning–Ferris*, 865 S.W.2d at 927. Because there is no evidence that Jade persuaded anyone to breach its contractual relationship with Paul Mitchell, the trial court properly disregarded the jury's findings and granted judgment notwithstand-

ing the verdict on the tortious interference claim.

■ Likewise, there is no evidence that either Jade or Randalls conspired to knowingly induce anyone to breach her contractual relationship within Paul Mitchell's distribution network. The trial court correctly disregarded the jury's findings and rendered a take-nothing judgment on the conspiracy claims.

### C. Measure of Damages

■ As a matter of law, appellants were not entitled to exemplary damages in the absence of an award of actual damages. *See Nabours v. Longview Sav. & Loan Ass'n*, 700 S.W.2d 901, 903 (Tex. 1985). Having found no evidence to support Randalls's and Jade's liability for actual damages under any of the theories advanced by the appellants, we need not detail the lack of evidentiary support for the amount of actual and exemplary damages awarded by the jury.

We thus hold that the trial court did not err when it disregarded all the jury's findings related to damages and rendered judgment that appellants take nothing, notwithstanding the verdict.

## II. INJUNCTIVE RELIEF

■ The appellants likewise complain in their first issue that the trial court erred in failing to grant injunctive relief based on the jury's affirmative answers to Questions 1, 5, 15, 16, and 17. Paul Mitchell wanted the trial court to permanently enjoin Randalls and Jade from buying or selling Paul Mitchell products. To be entitled to injunctive relief, a party must demonstrate the existence of a wrongful act, imminent harm, irreparable injury, and the absence of an adequate remedy at law. *See Frey v. DeCordova Bend Estates Owners Ass'n*, 632 S.W.2d 877, 881 (Tex.App.—Fort Worth 1982), *aff'd*, 647 S.W.2d 246 (Tex.1983). Without proof of all four elements, injunctive relief is improper.

### A. Wrongful Act

The jury found that Jade and Randalls both committed the following wrongful acts that Paul Mitchell must prove to obtain permanent injunctive relief:

♦ Had in their possession, sold, or offered for sale Paul Mitchell products that they knew or should have known had had serial numbers or other permanent identification markings removed, altered, or obliterated (Answer to Question 1);

♦ Knowingly disseminated statements that materially misrepresented the cost or character of Paul Mitchell products for the purpose of inducing customers to purchase those products (Answer to Question 5);

♦ Unfairly competed with Paul Mitchell by purchasing or distributing Paul Mitchell products (Answer to Question 15);

♦ Infringed on Paul Mitchell's trademark by purchasing or distributing Paul Mitchell products (answer to Question 16);

♦ Their purchase or distribution of Paul Mitchell products was likely to injure Paul Mitchell's business reputation or dilute the distinctive quality of its trademark (Answer to Question 17).

We will examine the record to determine if more than a scintilla of evidence supports the jury's finding of any of these wrongful acts.

### (1) Criminal offenses

Section 31.11 of the Texas Penal Code prohibits the removal, alteration, or obliteration of a serial number or permanent identification marking on tangible personal property, or the possession or sale of property whose permanent identification marking has been so altered. *See* Tex. Penal Code Ann. § 31.11 (West Supp.2000). By its answer to Question One, appellants

claim that the jury found Jade and Randalls violated this statute. Paul Mitchell contends that there is sufficient evidence that the defendants both "possessed stolen property" and destroyed batch codes and ultraviolet codes to support this finding. Additionally, Paul Mitchell urges that this offense constitutes the wrongful act that is a prerequisite for its obtaining injunctive relief, relying on *Featherstone v. Independent Service Station Ass'n*, 10 S.W.2d 124, 128–29 (Tex.Civ.App.—Dallas 1928, no writ).

Jade and Randalls respond that the trial court did not err in disregarding this finding because there is no evidence that they violated this statute, either by possessing stolen property or by obliterating batch or ultraviolet codes. They further urge that the *Featherstone* decision does not stand for the proposition that the commission of a crime *per se* suffices to invoke the equitable powers of the trial court.

We agree that *Featherstone* does not stand for the proposition that an injunction will issue because the complained-of conduct is a crime, but rather holds that equity will not be deterred when the conduct is *also* subject to criminal sanctions: "[W]hen necessary to protect civil or property rights, equity will interfere, and the fact that the commission of a statutory offense must be enjoined, as an incident to the giving of proper relief, will not deprive the court of its jurisdiction in this respect." *Featherstone*, 10 S.W.2d at 127. The more important distinction is *Featherstone*'s holding that the *undisputed facts* in that case supported the trial court's finding that the defendants had engaged in the criminal conduct. By contrast, we have searched this record and found no evidence that these defendants were guilty of possessing stolen property or of altering any codes in violation of the statute. We further find that the defendants' ownership of the products at issue supplies an affirmative defense to the conduct prohibited by section 31.11. *See* Tex. Penal Code Ann. § 31.11(b).

Paul Mitchell has relied upon a criminal statute that does not fit the alleged wrong-doing it seeks to enjoin. Section 31.11 prohibits the removal of a serial number or other permanent identification, *see id.* § 31.11(a); a serial number or other permanent identification is a unique number that allows a particular piece of property to be identified, for example the vehicle identification number of an automobile or a unique number etched into a bicycle or stereo equipment to allow stolen property to be traced. *See e.g.,* Tex. Transp. Code Ann. § 501.002(18) (West Supp.2000) (defining serial numbers for automobiles). We infer that the legislature criminalized the removal of permanent identification markers because this conduct facilitates theft.

Paul Mitchell has misapplied this criminal statute to the marketing practices at issue here; altering batch or ultraviolet codes is not done in preparation to steal these goods, nor are these codes unique serial numbers designed to allow stolen property to be traced. Indeed the same batch code will be applied to thousands of gallons of a product; there is nothing unique about a batch code that identifies a particular bottle of the product. Likewise, the ultraviolet codes are unique to a distributor but not to a product. We hold that this criminal statute does not sanction the economic conduct complained of in this lawsuit.

Even if the permanent identification markers referred to in the statute could be interpreted to apply to batch codes or ultraviolet codes, section 31.11(b)(1) provides that it is an affirmative defense if the accused is the owner of the property. The record establishes that Jade bought the Paul Mitchell products from unidentified brokers and Randalls bought the products from Jade. Buying the products would make Jade and Randalls "owners," and would provide them the affirmative defense set forth in section 31.11(b)(1). This buying of Paul Mitchell products from authorized or unau-

thorized distributors is indeed the activity that appellants sought to enjoin. There is insinuation, but no evidence, that either Jade or Randalls possessed stolen products. Several times during cross-examination, counsel for Paul Mitchell "suggested" that products on Randalls's shelves had to be either "counterfeit, stolen, or obtained from someone who is breaching their contract." This suggestion attempted to equate "stealing" with buying from someone who breached a contract. A suggestion from counsel is not evidence, and we find no evidence of theft in the record. Nor is there any evidence from which the jury could reasonably have inferred that either defendant possessed stolen products. "When circumstances are consistent with either of two facts and nothing shows that one is more probable than the other, neither fact can be inferred." *Litton Indus. Prods., Inc. v. Gammage,* 668 S.W.2d 319, 324 (Tex.1984). It is as likely or more likely that the products in Jade's and Randalls's possession had been diverted by a Paul Mitchell distributor or salon, not stolen. Indeed this lawsuit was initiated to halt the diversion of products from Paul Mitchell's closed distribution system.

■ Nor do we find any evidence that either Jade or Randalls "removed, altered, or obliterated" codes from Paul Mitchell products. Jade's chief executive officer stated Jade had never tampered with the codes of Paul Mitchell products. The record contains no evidence that Jade tampered with the codes of products it then sold to Randalls. There was no evidence or even suggestion that Randalls altered codes. Although some products with altered codes were recovered from Randalls's shelves, and Randalls bought the products only from Jade, this alone is not evidence of tampering by Jade. It was just as likely or more likely that the broker who sold the products to Jade tampered with the codes to prevent his breach from being detected. And again, even if Jade had tampered with some codes, its ownership of products it had purchased

would serve as a defense to penal sanctions under this statute.

■ It is a criminal offense to disseminate a statement that "materially misrepresents the cost or character" of tangible personal property for the purpose of selling that property. *See* Tex. Bus. & Com. Code Ann. § 17.12 (West 1987). The jury found in answer to Question Five that Randalls and Jade knowingly disseminated statements that materially misrepresented the cost or character of Paul Mitchell products to induce their customers to purchase them. Randalls argues that this statute was enacted to protect consumers and that Paul Mitchell is not a consumer and may not obtain any relief, injunctive or otherwise, premised on a violation of this statute. Assuming without deciding that violation of this statute would constitute some evidence of a wrongful act, we nevertheless find no evidence that Randalls or Jade violated the statute.

Paul Mitchell points to evidence that the defendants worked together to divert Paul Mitchell products, "representing them to be genuine, when they actually knew that they were stolen, counterfeit or acquired by breach of contract." As we have detailed above, there is no evidence other than innuendo that the products sold by Randalls or Jade were stolen. Nor is there legally sufficient evidence that the Paul Mitchell products sold by Randalls were not genuine, that is, not manufactured by Paul Mitchell or of a different quality due to tampering or mishandling. Paul Mitchell's corporate counsel suggested that because some of the products did not bear the original batch code, they may not have been genuine Paul Mitchell products. Altered batch codes alone provide no evidence that the products were not manufactured by Paul Mitchell. There is no evidence, for example, that the removal of codes resulted in gouging the bottles so that the products were contaminated. *See Graham Webb Int'l Ltd. v. Emporium Drug Mart, Inc.,* 916 F.Supp. 909, 916 (E.D.Ark.1995) (mere removal of batch

codes does not show that products are counterfeit or have been tampered with). *But see Pete–N–Larry's*, 862 F.Supp. at 1026 (codes crudely chiseled off bottles caused punctures that might lead to contamination). Finally, appellants point to no evidence that Randalls misrepresented to its customers the cost or character of the Paul Mitchell products it sold, and we have found none. This criminal statute is also misapplied to this economic activity, and there is no evidence of such an offense that would support the finding of a wrongful act.

For all of the reasons stated, we hold that Paul Mitchell's reliance on criminal conduct under these two statutes does not serve its effort to obtain injunctive relief. The trial court did not err in disregarding the jury's answers to Questions One and Five or in failing to grant injunctive relief on these grounds.

### (2) Trademark Infringement and Unfair Competition

■ Paul Mitchell also relies on Jade's and Randalls's common law intellectual property violations as wrongful acts that support its request for equitable relief. In answer to Question Fifteen, the jury found that Jade and Randalls competed unfairly because the products they sold had material differences from the products manufactured by Paul Mitchell and these differences tended to injure Paul Mitchell's reputation and goodwill. In Answer to Question Sixteen, the jury found that Jade and Randalls had infringed on Paul Mitchell's trademark because of material differences between the products as manufactured and the products they sold, which created a likelihood of confusion among consumers. In Answer to Question Seventeen the jury found that the acts of Jade and Randalls tarnished the goodwill

and reputation associated with Paul Mitchell's trademark or diminished its uniqueness and individuality. We will consider whether there is any evidence to support these findings.

■ The common basis of the torts of unfair competition and trademark infringement is a likelihood of consumer confusion as to the source of the goods. *See Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587, 590–92 (5th Cir.1993); *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F.Supp. 1513, 1554 (S.D.Tex. 1996), *aff'd as modified*, 155 F.3d 526 (5th Cir.1998). "[T]he general rule is that 'trademark law does not apply to the sale of genuine goods bearing a true mark, even if the sale is without the mark owner's consent.'" *Id.* at 590 (quoting *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir.1991)) (dismissing similar effort to prevent diversion of hair products from closed distribution system to retail outlet alleging trademark infringement and unfair competition under federal law). Confusion may result when one party passes off its goods as those of another.[3] That has not happened here. "[T]he mere fact that the sale is unauthorized—that is, without consent—does not give rise to an infringement claim when the marked goods are genuine." *Pete–N–Larry's*, 862 F.Supp. at 1023. Appellees insist that there is no confusion because they are selling genuine Paul Mitchell products identical to those sold by authorized distributors and salons. To prevail, Paul Mitchell must establish that there are material differences between the products Paul Mitchell manufactures and the products that appellees sell. *See id.* The jury found a material difference sufficient to create consumer confusion, but we find no

---

3. Unfair competition "consists in the simulation by one person, for the purpose of deceiving the public, of the names, symbols, labels, or devices employed by a business rival, in order to induce the purchasing public to buy his products in the belief that they are those of his rival." *Avnet v. Texas Centennial* *Cent. Exposition*, 96 S.W.2d 685, 687 (Tex. Civ.App.—Dallas 1936, writ dism'd w.o.j.) (internal quotations omitted) (quoting *Queen Mfg. Co. v. Isaac Ginsberg & Bros.*, 25 F.2d 284 (8th Cir.1928)). Absent consumer confusion, Paul Mitchell cannot prevail on its claim of trademark infringement.

evidence in the record to support this finding, that is, no evidence that the products sold by Randalls or Jade are anything other than genuine.

[27] We have earlier rejected the suggestion that defaced batch codes alone are legally sufficient evidence that the product inside the bottles is not genuine (without, for example, proof of puncturing that might lead to contamination). *See supra* pp. 734–35. Here there was no evidence that removal of the batch codes defaced the bottles or compromised the quality of the products. Nor does the removal of batch codes alone establish a material difference due to lack of quality control. The quality of the product was injected by Paul Mitchell in the manufacturing process; absent evidence of tainting or mishandling, an unauthorized sale does not create a material difference on the basis of quality. *See Matrix*, 988 F.2d at 592 ("Matrix's use of professional hair care salons as its exclusive distribution channel seems more marketing-related than quality-related.").

And each Paul Mitchell product disclaimed any guarantee of a product sold in a supermarket; no consumers were confused in that regard. We reject Paul Mitchell's claim that sale of its product without professional consultation gives rise to consumer confusion. There is no evidence in the record that customers who purchased these hair products from Randalls were confused or deceived by thinking that they would receive professional consultation with their purchase. *See id.; Graham Webb Int'l*, 916 F.Supp. at 916. The lack of evidence of a material difference or defect leading to confusion of customers is fatal to Paul Mitchell's claim of unfair competition, as well as its trademark protection claims. *See Matrix*, 988

F.2d at 592 (touchstone of unfair competition is likelihood of consumer confusion).

■■■ Furthermore, the "first sale" doctrine precludes appellant from recovery under trademark infringement or unfair competition. Once Paul Mitchell sold its product to an authorized distributor, placing it into the stream of commerce, it had no right thereafter to control the distribution of its trademarked products. *See Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir.1995), *cert. denied*, 516 U.S. 914, 116 S.Ct. 302, 133 L.Ed.2d 207 (1995) (applying first sale doctrine to diverted salon products being sold by retail chain); *Matrix*, 988 F.2d at 593 (citing *NEC Elecs. v. CAL Circuit Abco*, 810 F.2d 1506 (9th Cir.), *cert. denied*, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987)). There is sufficient evidence that Paul Mitchell routinely sells its products to authorized distributors; the particular distributor need not be identified to satisfy the first sale doctrine. *See Quality King Distribs. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 118 S.Ct. 1125, 1128, 140 L.Ed.2d 254 (1998). The Fifth Circuit concluded that this doctrine precludes liability for trademark infringement and unfair competition under federal law for merely reselling a product without authorization. *See Matrix*, 988 F.2d at 593. We hold that the same is true under common law actions in Texas.

■■■ Finally, we address Paul Mitchell's claim that Randalls diluted its trademark in violation of section 16.29 of the Texas Business and Commerce Code. *See* Tex. Bus. & Com.Code Ann. § 16.29 (West Supp.2000).[4] Both forms of dilution—tarnishment and blurring—require that the defendant use the plaintiff's trademark on the defendant's own goods. *See Pebble*

---

**4.** Section 16.29 provides in full:
A person may bring an action to enjoin an act likely to injure a business reputation or to dilute the distinctive quality of a mark registered under this chapter or Title 15, U.S.C., or a mark or trade name valid at common law, regardless of whether there is competition between the parties or confusion as to the source of goods or services. An injunction sought under this section shall be obtained pursuant to Rule 680 et seq. of the Texas Rules of Civil Procedure. Tex. Bus. & Com.Code Ann. § 16.29.

*Beach,* 942 F.Supp. at 1564–67. As a matter of law there can be no blurring or tarnishment under section 16.29 where a retailer has resold the mark owner's genuine products. *See id.*

Because there is no evidence of a material difference that would lead to consumer confusion, Paul Mitchell cannot prevail on its claims of trademark infringement or unfair competition. As a matter of law, Randalls and Jade did not dilute appellant's trademark. Therefore, the trial court did not err in disregarding the jury's answers to Questions One, Five, Fifteen, Sixteen, and Seventeen and denying injunctive relief to appellants.

Having considered all of appellants' theories supporting their recovery of damages and their entitlement to injunctive relief and finding them unsupported by the evidence or the law, we overrule the first issue complaining of the judgment notwithstanding the verdict.

## TRADE SECRET

■ In their second issue on appeal, Paul Mitchell and Ultimate Salon complain that the trial court erred in ruling that Jade's list of suppliers was protected from discovery as a trade secret. We review a trial court's discovery rulings under an abuse of discretion standard. *See General Tire, Inc. v. Kepple,* 970 S.W.2d 520, 526 (Tex.1998).

The trade secret privilege is set forth in Texas Rule of Evidence 507, which provides in full:

A person has a privilege, which may be claimed by the person or the person's agent or employee, to refuse to disclose and to prevent other persons from disclosing a trade secret owned by the person, if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice. When disclosure is directed, the judge shall take such protective measure as the interests of the holder of the privilege and of the parties and the furtherance of justice may require.

Tex.R. Evid. 507. The supreme court has recently addressed the scope of this privilege. *See In re Continental Gen. Tire, Inc.,* 979 S.W.2d 609, 611–13 (Tex.1998). In determining the correct approach to Rule 507, the supreme court relied heavily on two opinions applying almost identical trade secret privileges in California and Florida. *See id.* at 611–12 (citing *Bridgestone/Firestone v. Superior Court,* 7 Cal. App.4th 1384, 9 Cal.Rptr.2d 709 (1992); *Rare Coin–It, Inc. v. I.J.E., Inc.* 625 So.2d 1277 (Fla.Ct.App.1993)). It began by noting that Rule 507 seeks to protect two competing interests: (1) trade secrets are an important property interest worthy of protection, and (2) all facts necessary for the fair adjudication of a lawsuit must be disclosed. *See id.* at 612. The trial court is to apply a balancing test that employs shifting burdens. The party resisting discovery must first establish that the information is a trade secret. The burden then shifts to the requesting party to show that the information is "necessary for a fair adjudication of its claims." *Id.* at 613. The court cites with approval the standard applied in federal courts: "[T]he burden is on the party seeking discovery to establish that the information is sufficiently relevant and necessary to his case to outweigh the harm disclosure would cause to the person from whom he is seeking the information." *Id.* at 612 (alteration in original) (internal quotations omitted) (quoting 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice & Procedure,* § 2043 (2d ed.1994)). The requesting party must show something more than that the information is relevant: "Rule 507 clearly contemplates a heightened burden for obtaining trade secret information." *Id.* at 613–14. The two competing interests served by Rule 507 are best accommodated by requiring disclosure "only if necessary for a fair adjudication of the requesting party's claims or defenses." *Id.* at 612.

We now turn to the particular facts of this case to determine if the trial court abused its discretion in refusing to compel discovery of Jade's list of suppliers. A trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 455 (Tex.1994). To meet its burden of establishing trade secret protection, Jade had to satisfy the Restatement's six-factor test:

(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Chapa v. Garcia,* 848 S.W.2d 667, 670 (Tex. 1992) (Doggett, J., concurring) (internal quotations omitted) (quoting Restatement of Torts § 757 cmt. b (1939)). Appellants argue that they are not direct competitors and therefore Jade can claim no trade secret protection for its list of suppliers. The supreme court has rejected the claim that trade secrets should be produced except in actions between business competitors, saying that this approach "would render the Rule 507 privilege meaningless in noncompetitor cases." *Continental Gen. Tire,* 979 S.W.2d at 613. Moreover, we are not persuaded that Paul Mitchell does not compete with Jade when this lawsuit is grounded in the claim that the unauthorized sale of its hair products by Jade and Randalls constitutes unfair competition. We reject appellants' argument that trade secret protection is not available in this case.

Alternatively, appellants argue that Jade failed to establish that its list of suppliers had commercial value or would be valuable to its competitors. We disagree. In his affidavit, Jade's president Harold Wallace named the restricted number of individuals with access to the list of suppliers, explained that the list took time and money to develop, and described the list's value to Jade. He also specified that the information could not be readily obtained or duplicated. Information may be privileged if valuable only to the owner. *See Chapa,* 848 S.W.2d at 670. Wallace's affidavit established that the supplier list enabled the company to obtain Paul Mitchell products to sell to retail outlets like Randalls, Kroger's, and Drug Emporium. He also established that many of Jade's competitors would be eager to compete in these retail markets if they could identify Jade's source of products. Customer lists, pricing information, customer preferences, buyer contacts and market strategies have been shown to be trade secrets. *See T–N–T Motorsports, Inc. v. Hennessey Motorsports, Inc.,* 965 S.W.2d 18, 22 (Tex.App.— Houston [1st Dist.] 1998, no pet.). Jade's carefully compiled and closely guarded source of Paul Mitchell hair care products serves a similar purpose. Because there is evidence that satisfies the six factors, we hold that Jade met its burden of establishing trade secret protection for its list of suppliers.

The burden then shifted to Paul Mitchell to show that the list of suppliers was necessary for a fair adjudication of its claims. *See Continental Gen. Tire,* 979 S.W.2d at 613. The trial court's role was to weigh the degree of the requesting party's need for the information against the potential harm of disclosure to the resisting party. *See id.* Trade secrets should only be disclosed when the information is both "material and necessary to the litigation and unavailable from any other source." *Automatic Drilling Machs., Inc.*

*v. Miller,* 515 S.W.2d 256, 259 (Tex.1974). The requesting party must describe with particularity how the protected information is required to reach conclusions in the case. *See Continental Gen. Tire,* 979 S.W.2d at 611 (citing *Bridgestone/Firestone,* 9 Cal.Rptr.2d at 716). The requested information must be necessary, not merely useful. *See id.*

Paul Mitchell argues that identifying how and where Jade obtained its products was the "central issue" in this case. It is unclear how the identity of Jade's suppliers advanced Paul Mitchell's breach of contract, trademark infringement, or tortious interference claims against Jade and Randalls. But assuming this information would have been useful to Paul Mitchell, there is evidence in the record that the suppliers, or some of them, could have been identified by ultraviolet codes placed on the bottles to identify distributors. Michaeline Re', chief legal officer for Paul Mitchell, testified that she personally examined all the Paul Mitchell products found at Randalls to determine if batch codes (identifying the laboratory where the product was manufactured) or ultraviolet codes (identifying the distributor) had been tampered with. Although some of the UV codes had been removed or obliterated, Plaintiff's Exhibit 112 revealed that item Nos. 12 and 22 had intact UV codes on the bottles. Ms. Re' continued to testify that the UV codes were used to identify the distributor to which products were shipped. The parties stipulated that Randalls purchased Paul Mitchell products only from Jade. The trial court could have determined that Paul Mitchell had other methods of tracing these products back to certain distributors in its system. The trial court could have concluded that Jade's list of suppliers was therefore not necessary to a fair adjudication of Paul Mitchell's claims in this lawsuit. Applying the balancing test mandated by *Continental General Tire,* we cannot say that the trial court abused its discretion in refusing to compel disclosure of Jade's list of suppliers. We overrule the second issue.

## JURY SUBMISSIONS

In their final issue on appeal, Paul Mitchell and Ultimate Salon complain of the trial court's failure to submit their theory of conversion to the jury and its failure to submit damage issues for conversion, trademark infringement, and unfair competition. Because this record contains no evidence that Jade or Randalls possessed any products that had been stolen from Paul Mitchell or Ultimate Salon, the trial court did not err in refusing to submit to the jury conversion as a theory of recovery or its accompanying issue on damages. Likewise, because we have held that the appellants are not entitled to recover for trademark infringement or unfair competition as a matter of law, the trial court did not err in refusing to submit damage issues on these theories. We overrule the third issue on appeal.

## CONCLUSION

Having overruled all of appellants' issues on appeal, we affirm the trial court's judgment notwithstanding the verdict.