

## NUMBER 13-09-00657-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

| | |
|---|---|
| **HINO ELECTRIC HOLDING COMPANY, L.P. D/B/A HINO ELECTRIC POWER COMPANY,** | **Appellant,** |
| **v.** | |
| **CONSTELLATION NEWENERGY, INC., ET AL.,** | **Appellees.** |

### On appeal from the 357th District Court of Cameron County, Texas.

# MEMORANDUM OPINION

**Before Justices Garza, Vela, and Perkes**
**Memorandum Opinion by Justice Garza**

In this lawsuit, appellant, Hino Electric Holding Company, L.P. d/b/a Hino Electric Power Company ("Hino"), filed claims against appellees, Constellation NewEnergy ("Constellation") and CP&L Retail Energy L.P. ("CP&L"), for tortious interference with existing and prospective contracts. At the conclusion of Hino's case-in-chief,

Constellation and CP&L moved for a directed verdict, which the trial court granted. On appeal, Hino argues that the record contains sufficient probative evidence to raise fact issues as to the essential elements of its tortious interference claims; thus, the trial court erred in directing verdict in favor of Constellation and CP&L. We affirm.

## I.   BACKGROUND

On December 28, 2005, Hino and the City of Harlingen (the "City") entered into a "Master Power Sales Agreement," whereby Hino agreed to provide electricity to the City from January 1, 2006 to December 31, 2006. In April 2006, Hino proposed that the City agree to a "Blend and Extend" option, which would allow the City to lock in energy prices at a lower rate for 2007, because Hino forecasted that energy prices would increase during 2007.

On April 26, 2006, the City agreed to the "Blend and Extend" option, which was purportedly effective from December 31, 2006 to September 30, 2007.[1] However, included in the "Blend and Extend" contract was a "continuing right" for the City to terminate the contract "at the expiration of each budget period during the term of the 'Blend and Extend' contract." On April 28, 2006, prior to the parties signing the "Blend and Extend" contract, Hino procured 32,755 megawatts of electricity from Coral Power, L.L.C. for delivery to the City from January 1, 2007 to September 30, 2007, for the term of the "Blend and Extend" contract.

---

[1] Hino attempted to persuade the City to agree to the "Blend and Extend" option for a period of several years; however, the City Attorney notified City Council members that the City could not enter into a contract with Hino exceeding one year. Thus, the City Council members agreed to a nine-month "Blend and Extend" option. And, to ensure that the "Blend and Extend" option was legal, the City Attorney drafted the contract. Though the City agreed to the "Blend and Extend" contract on April 26, 2006, the parties did not sign the contract until June 27, 2006.

Falling energy prices in September 2006 prompted the City to look for a lower electricity price. Thereafter, at a meeting conducted on September 27, 2006, the City Attorney requested that Hino present alternative pricing to the City or else the City would opt to terminate the "Blend and Extend" contract in accordance with its terms. In addition, the City requested that R.J. Covington, a consultant for the South Texas Aggregation Project ("STAP"), ask several retail energy providers, including Constellation, to provide indicative price quotes covering October through December 2006.

At the September 27, 2006 meeting, Hino agreed to submit alternative pricing to and renegotiate with the City; however, at a subsequent meeting held the next day, Hino appeared with counsel, declined to provide alternative pricing, and insisted that the City had no authority to opt out of the "Blend and Extend" contract. At the conclusion of the September 28, 2006 meeting, the City voted to opt out of the "Blend and Extend" contract and to revert to the terms of the one-year "Master Power Sales Agreement." In compliance with the "Master Power Sales Agreement," the City continued to pay Hino for all electricity delivered to the City through the end of 2006.

In October 2006, the City Attorney sent official requests for pricing ("RFPs") to various energy suppliers.[2] Among the suppliers that responded was Constellation, which provided a price quote and an offer to supply energy to the City at a specified price. On October 26, 2006, Gloria Cordoba, an account executive for CP&L, cold-called the City to inquire about its energy needs. Cordoba was directed to the City

_____

[2] On appeal, Constellation states that RFPs "are intended to operate as offers," whereas an "'indicative price quote' does not act as an offer, but as a mere indication of the price for which energy might be purchasable during a given period."

3

Attorney's office, who informed her that the City was looking for a supplier for 2007. The City Attorney authorized Cordoba to access the City's usage information, and Cordoba, on behalf of CP&L, provided the City with a price quote and an offer to supply energy to the City. Faced with competing offers from Constellation and CP&L, the City chose to enter into an agreement with CP&L to provide the City with electricity in 2007, once the "Master Power Sales Agreement" with Hino expired.

After learning that the City entered into a contract with CP&L to provide electricity for calendar year 2007, Hino sued the City for breach of contract, requesting that the City specifically perform under the "Blend and Extend" contract and pay damages of $603,691.07 for the electricity bought by Hino for delivery during the term of the "Blend and Extend" contract.[3] Hino subsequently amended its petition to add Constellation and CP&L as defendants, alleging that Constellation and CP&L tortiously interfered with existing contracts between Hino and the City by persuading the City to breach its contract with Hino. Despite its allegations, Hino did not clearly specify which contract it claimed Constellation and CP&L interfered with.

In August 2009, the matter was tried to a jury. After Hino rested its case-in-chief, the trial court granted directed verdicts in favor of Constellation and CP&L and entered a take-nothing judgment against Hino on August 26, 2009. Within thirty days of the trial court's signing of its final judgment, Hino filed a motion for new trial arguing that there is a material fact issue as to Constellation and CP&L's "intent and knowledge of the interference at issue in this cause," and thus, these fact issues should have been submitted to the jury and not decided by directed verdict. *See* TEX. R. CIV. P. 329b(a)

---

[3] The record demonstrates that Hino's claims against the City were severed from its claims against Constellation and CP&L, and summary judgment was then granted in favor of the City. The City is not a party to this appeal.

4

(providing that a motion for new trial shall be filed within thirty days after the complained-of judgment or order is signed). Hino's motion for new trial, however, was overruled by operation of law. *See id.* at R. 329b(c). This appeal ensued.

## II.   STANDARD OF REVIEW

In reviewing a trial court's directed verdict or judgment as a matter of law, we conduct a legal-sufficiency analysis of the evidence. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). Evidence is legally sufficient if:

> the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. Whether a reviewing court begins by considering all the evidence or only the evidence supporting the verdict, legal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.

*Id.* at 827. Moreover, in reviewing a directed verdict, we consider all the evidence presented at trial, viewing it in the losing party's favor as much "as the record allows." *S.V. v. R.V.*, 933 S.W.2d 1, 8 (Tex. 1996); *see Szcepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994); *see also Rodriguez v. United Van Lines, Inc.*, 21 S.W.3d 382, 383 (Tex. App.–San Antonio 2000, pet. denied).

A court may grant a directed verdict "if no evidence of probative force raises a fact issue on the material questions in the suit." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *see Szcepanik*, 883 S.W.2d at 649. When no evidence of probative force on an ultimate fact element exists, or when the probative force of the evidence is so weak that only mere surmise or suspicion is raised as to the existence of essential facts, the trial court has a duty to instruct the verdict. *Villarreal v. Art. Inst. of Houston, Inc.*, 20 S.W.3d 792, 796 (Tex. App.–Corpus Christi

5

2000, no pet.); *see Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 443 (Tex. App.–Dallas 2002, pet. denied).

Essentially, there are two specific situations in which a defendant should be granted a directed verdict: (1) when the plaintiff fails to offer probative evidence of an essential element of the claim; or (2) when the plaintiff "admits or the evidence conclusively establishes a defense to the plaintiff's cause of action." *Prudential Ins. Co. of Am.*, 29 S.W.3d at 77. However, a reviewing court may affirm a directed verdict if the trial court's rationale for granting the directed verdict is erroneous, provided it can be supported on another basis. *Exxon Corp.*, 82 S.W.3d at 443; *Kelly v. Diocese of Corpus Christi*, 832 S.W.2d 88, 90 (Tex. App.–Corpus Christi 1992, writ dism'd w.o.j.).

### III.  ANALYSIS

In its sole issue on appeal, Hino asserts that the trial court improperly granted directed verdicts in favor of Constellation and CP&L because the record contains probative evidence to raise fact issues on Hino's claims. Specifically, Hino argues that the record contains evidence that: (1) Hino and the City had a valid and existing energy contract—the "Blend and Extend" contract; (2) Constellation and CP&L intentionally interfered with that contract by submitting price quotes to the City; (3) such interference caused the City to terminate the "Blend and Extend" contract; and (4) caused Hino to sustain a contractual loss of $540,000 and $220,000 in lost profits. We disagree.

### A.  Applicable Law

To establish a tortious-interference-with-an-existing-contract claim, the plaintiff must show: (1) that an existing contract subject to interference existed; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's

6

injury; and (4) caused actual damages or loss.  *See Prudential Ins. Co. of Am.*, 29 S.W.3d at 77 (citing *ACS Invs., Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997)). On the other hand, the elements of tortious interference with prospective business relations are:  (1) a reasonable probability that the plaintiff would have entered into a contractual relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did the act with a conscious desire to prevent the relationship from occurring or with knowledge that the interference was certain or substantially certain to occur as a result of his conduct; and (4) the plaintiff suffered actual harm or damage as a result of the interference.  *See Ash v. Hack Branch Distrib. Co.*, 54 S.W.3d 401, 414-15 (Tex. App.–Waco 2001, pet. denied); *see also Finlan v. Dallas Indep. Sch. Dist.*, 90 S.W.3d 395, 412 (Tex. App.–Eastland 2002, pet. denied).

## B.  Constellation's Involvement

The record reflects that Constellation was not awarded the contract to provide the City with electricity for the 2007 calendar year; instead, Hino's contention that Constellation intentionally interfered with Hino's "Blend and Extend" contract with the City is premised solely on the fact that Constellation submitted price quotes to the STAP that were lower than those provided by Hino.  Joshua Hansel, a senior director for Constellation, testified that, if a customer requests a price quote, Constellation representatives usually will ask the customer when their current contract expires or when the pricing should begin.  Constellation did not ask the City about any pending contracts with other providers because Constellation transacted through the STAP. Hansel stated that there is nothing wrong with the customer obtaining price quotes from

7

energy providers even though the customer is under contract with another provider. When Constellation gave the STAP price quotes to pass along to the City, Hansel did not have any knowledge of Hino's "Blend and Extend" contract with the City. He denied ever directly contacting the City to "get their business."

Hansel recalled that the STAP informed him that the City requested pricing information from ten or twelve different providers; that six providers responded to the request; and that the offers submitted by CP&L and Constellation were the final ones considered by the City. Hansel stated that it is "standard procedure to respond to this request for pricing knowing that the customer has an existing contract . . . . Because the request is made for pricing as represented by the customer starting when their current contract expires." By waiting to negotiate until after the current contract expired, the customer "could miss the best time to lock in a price" and "the lights would go out if you couldn't get a deal done at the end of the year, and you don't want to risk that." Hansel also noted that energy providers typically rely on the representations of customers as to when their contracts expire.[4] Finally, Hansel stated that Constellation did not intend to interfere with Hino's contract, and that Constellation did not intend for the City to breach any existing contracts. Hansel further stated that Constellation found out about Hino's "Blend and Extend" contract after litigation commenced.

---

[4] On cross-examination, Hansel admitted that Constellation could have filed an open-records request with the City to see their contracts with Hino; however, Hansel argued that such actions are not typically done; that the providers usually rely on the representations of the customer regarding the terms of existing contracts; and that the energy providers are not positioned to give legal advice to customers about the terms of their existing agreements. In fact, even Alex Hinojosa Jr., President and Chief Executive Officer of Hino, testified that he relies on the representations of government officials regarding the expiration of existing contracts and does not make an open-records request each time a municipality requests a bid from Hino. In addition, Hansel referenced a standard contract that Constellation issues, which includes a clause requiring the customer to warrant that no existing agreements are in effect during the time period covered by the Constellation contract.

8

First, based on the record before us, we cannot say that Constellation interfered with the "Master Power Sales Agreement" that Hino had with the City or that the City breached the agreement. It is true that the "Master Power Sales Agreement" was in effect at the time the price quotes were solicited from Constellation. However, Alex Hinojosa Jr., President and Chief Executive Officer of Hino, admitted that the City honored its obligations under the "Master Power Sales Agreement" and that Hino was paid all money due under the agreement. In fact, Hinojosa testified that, when Hino tried to bill the City in October 2006 under the reduced rate provided by the "Blend and Extend" contract, the City: (1) repeatedly notified Hino that the "Blend and Extend" contract had been terminated, (2) indicated that the billing of electricity for the duration of the 2006 calendar year should correspond with the "Master Power Sales Agreement", and (3) remitted full payment in accordance with the "Master Power Sales Agreement."

To the extent that Hino argues that Constellation's act of providing lower price quotes induced the City to terminate the "Blend and Extend" contract and, thus, constituted a tortious interference with contractual relations, we note that the record contains no evidence that Constellation was aware of the "Blend and Extend" contract at the time the price quotes were offered. For Constellation to be liable for tortious interference in this case, Hino was required to prove that Constellation had knowledge of the contract with which it was allegedly interfering and that Constellation intentionally interfered with such contract. *See Sw. Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992) (holding that "[i]nterference with a contract is tortious only if it is intentional"); *Frost Nat'l Bank v. Alamo Nat'l Bank*, 421 S.W.2d 153, 156 (Tex. App.–San Antonio 1967, writ ref'd n.r.e.) (concluding that a defendant must have had

9

actual knowledge, rather than merely actual notice, that his conduct would interfere with performance under an existing contract); *Steinmetz & Assocs., Inc. v. Crow*, 700 S.W.2d 276, 277-78 (Tex. App.–San Antonio 1985, writ ref'd n.r.e.) ("One element of a cause of action for interference with contract or business relation is that the interferer had actual knowledge of the contract or business relation in question, or knowledge of facts and circumstances that would lead a reasonable person to believe in the existence of the contract or business relationship."); *see also* RESTATEMENT (SECOND) OF TORTS § 766 cmt. i (1979) ("To be subject to liability under the rule stated in this Section[,] the actor must have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract. Although the actor's conduct is in fact the cause of another's failure to perform a contract, the actor does not induce or otherwise intentionally cause that failure if he has no knowledge of the contract.").

Hansel testified that Constellation transacted through the STAP rather than directly with the City, and, because the STAP was involved, the City must have been transacting for a period when no contract would be in effect. Hansel and Hinojosa both testified that it is customary in the energy industry for retail energy providers to rely on the representations of customers with regard to whether an existing contract is in effect at the time the price quote is provided.[5] It is also noteworthy that, as Hinojosa acknowledged, Hino entered into the "Master Power Sales Agreement" with the City in October 2004 using practices similar to those used by Constellation—i.e., by providing price quotes to the City even though the City was under contract at the time with another energy provider.

---

[5] In addition, included as an exhibit is a copy of the contract Constellation typically used with customers in similar situations as this. The Constellation contract requires the customer to, among other things, warrant that the contract does not interfere with other existing contracts.

10

Furthermore, "merely inducing one of the parties to exercise his right to terminate contractual relations after giving the required notice does not necessarily constitute tortious interference with contract under Texas law." *Juliette Fowler Hones, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 667 (Tex. 1990). In other words, a party must be more than a willing participant; he must knowingly induce one of the contracting parties to breach its obligations. *See Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 (Tex. 1993); *John Paul Mitchell Sys. v. Randalls Food Mkts.*, 17 S.W.3d 721, 731 (Tex. App.–Austin 2000, pet. dism'd w.o.j.); *see also Arabesque Studios, Inc. v. Academy of Fine Arts Int'l Inc.*, 529 S.W.2d 564, 568 (Tex. Civ. App.–Dallas 1975, no writ) (holding that a plaintiff must show that defendant caused the interference, and it is not enough that defendant reaped an advantage of a contract broken by the breaching party's own volition). The record in this case demonstrates that the City validly terminated the "Blend and Extend" contract in accordance with its terms. Thus, there is no evidence that the City breached any contractual obligations owed to Hino.

Based on the foregoing, we conclude that Hino failed to raise any fact issue as to its tortious interference claims against Constellation; in particular, the record contains no evidence that Constellation intentionally interfered with any contract or that Constellation committed any independently tortious or unlawful act that prevented a probable contractual relationship between Hino and the City from occurring. *See Ash*, 54 S.W.3d at 414-15; *Prudential Ins. Co. of Am.*, 29 S.W.3d at 77. We therefore hold that the trial court properly directed verdict in favor of Constellation. *See City of Keller*, 168 S.W.3d at 823; *Finlan*, 90 S.W.3d at 412.

**C. CP&L's Involvement**

11

With respect to CP&L, the record shows that Cordoba cold-called the City on October 26, 2006. Cordoba testified that she was motivated to contact the City about electricity prices after reading a story in the local newspaper that documented the City's negotiations with Hino about future electricity prices. Cordoba further testified that she always asks a potential customer when their contract is up for renewal before she quotes the customer electricity prices, which is a standard industry practice. When Cordoba cold-called the City, she was directed to the City Attorney, who informed her that the City was indeed looking for a new electricity provider. The City Attorney also informed Cordoba that the City was not under contract for 2007, and authorized Cordoba to analyze the City's historical usage information. Ultimately, CP&L provided the City with a competitive price quote, and the parties entered into a contract covering the 2007 calendar year, which was signed on November 1, 2006. When contacting the City about its electricity needs, Cordoba relied upon the City Attorney's representation that the City was not under contract for 2007. Cordoba noted that at the time the cold-call was made, she was completely unaware of the "Blend and Extend" contract. She presumed that the City was under contract with another provider for 2006; thus, she did not offer to provide electricity for the 2006 calendar year.

Cordoba, on behalf of CP&L, did not offer to provide electricity for the 2006 calendar year and, thus, did not interfere with the "Master Power Sales Agreement." Further, it was undisputed that the City did not breach the "Master Power Sales Agreement" and had, in fact, paid Hino for electricity consumed for the duration of the agreement. *See John Paul Mitchell Sys.*, 17 S.W.3d at 730 ("Texas courts have held that to satisfy [the "willful and intentional act of interference"] element of the cause of

12

action for tortious interference, a party must be more than a willing participant; it must knowingly induce one of the contracting parties to breach its obligations.") (citing *Reyna*, 865 S.W.2d at 927). Regarding the "Blend and Extend" contract, CP&L offered to provide the City with electricity on October 26, 2006, almost one month after the City had validly terminated the "Blend and Extend" contract. Thus, at the time of the cold-call, there was no contract between Hino and the City with which CP&L could interfere. *See Prudential Ins. Co. of Am.*, 29 S.W.3d at 77; *Exxon Corp. v. Allsup*, 808 S.W.2d 648, 654 (Tex. App.–Corpus Christi 1991, writ denied) ("A cause of action for interference with contractual relations requires evidence of the existence of a contract that is subject to the alleged interference."); *see also Juliette Fowler Homes, Inc.*, 793 S.W.2d at 666 ("Until a contract is terminated, it is valid and subsisting, and third persons are not free to tortiously interfere with it.") (citing *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 689 (Tex. 1989); RESTATEMENT (SECOND) OF TORTS § 766 cmt. g); *Davis v. HydPro, Inc.*, 839 S.W.2d 137, 139 (Tex. App.–Eastland 1992, writ denied) ("Merely entering into a contract with a party with knowledge of that party's contractual obligations to someone else is not the same as inducing a breach. It is necessary that there be some act of interference or of persuading a party to breach, for example by offering better terms or other incentives, for tort liability to arise.").

Based on the foregoing, we conclude that Hino failed to raise any fact issue as to its tortious interference claims against CP&L; in particular, the record contains no evidence that CP&L intentionally interfered with any contract or that CP&L committed any independently tortious or unlawful act that prevented a probable contractual relationship between Hino and the City from occurring. *See Ash*, 54 S.W.3d at 414-15;

13

*Prudential Ins. Co. of Am.*, 29 S.W.3d at 77. We therefore hold that the trial court properly directed verdict in favor of CP&L. *See City of Keller*, 168 S.W.3d at 823; *Finlan*, 90 S.W.3d at 412.

We overrule Hino's sole issue on appeal.

**IV. CONCLUSION**

The judgment of the trial court is affirmed.

_____
DORI CONTRERAS GARZA
Justice

Delivered and filed the
19th day of May, 2011.