

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-12-0372-CV

_____

IN RE MICHAEL ROCKAFELLOW; MTBC, LTD.;
AND TBC WAREHOUSE, INC., RELATORS

_____

April 30, 2013

## ON PETITION FOR WRIT OF MANDAMUS

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

Relators, Michael Rockafellow and his company, MTBC, Inc., have filed their petition for writ of mandamus, asking this Court to direct respondent, the Honorable Les Hatch of the 237th District Court of Lubbock County, to vacate the order of August 7, 2012, ordering Rockafellow and MTBC to disclose their suppliers of certain hair care products to real party in interest, SalonQuest, L.L.C. We will conditionally issue a writ of mandamus so directing.

## Factual and Procedural History

In the underlying case, SalonQuest has filed suit against Rockafellow, MTBC, Jane Does 1–5, and ABC Companies 1–5, alleging causes of action in tortious interference with contract and with business relations, civil conspiracy, and breach of contract. The substance of the discovery dispute stemming from this litigation, however, is not unfamiliar to this Court; that dispute had its beginning well before suit was filed. In 2010, SalonQuest learned that Rockafellow and MTBC had sold SalonQuest products to grocery store outlets in south and central Texas and, before filing suit against anyone, attempted to discover the identities of the distributors or authorized retailers from which MTBC had attained SalonQuest hair care products and which, by selling product to MTBC, had diverted SalonQuest products outside the distribution channel that SalonQuest has designed and to which SalonQuest and its customers had agreed by contract. To that end, SalonQuest filed its petition in the trial court seeking pre-suit deposition of Rockafellow. See TEX. R. CIV. P. 202. Ultimately, the trial court granted the relief SalonQuest requested and authorized (1) pre-suit deposition of Rockafellow and (2) disclosure of documents related to MTBC's acquisition of SalonQuest's hair care products, both tools in furtherance of SalonQuest's efforts to learn the identities of the companies or individuals from whom MTBC obtained SalonQuest products for later resale to unauthorized retail outlets.

Rockafellow sought extraordinary relief from this Court by way of petition for writ of mandamus, asking that this Court direct respondent to vacate the January 2011 order authorizing pre-suit deposition of Rockafellow on the basis that the identities of Rockafellow's suppliers were protected by the trade secret privilege and that

2

SalonQuest had not made the requisite showing that the requested information was necessary for a fair adjudication of its claims such that it would be entitled to compel the disclosure of trade secret information. See In re Rockafellow, No. 07-11-00066-CV, 2011 Tex. App. LEXIS 5495 (Tex.App.—Amarillo July 29, 2011, orig. proceeding) (mem. op.). We agreed and conditionally granted mandamus relief directing the respondent to vacate the order authorizing pre-suit deposition of Rockafellow. See id. at *12–14.

Months later, SalonQuest filed suit against Rockafellow, MTBC, and the Doe and ABC defendants. It is this pending suit which gives rise to the instant petition for writ of mandamus. After filing suit, SalonQuest once again sought to discover the identities of individuals or entities from whom Rockafellow and MTBC obtained its supply of SalonQuest products. Rockafellow and MTBC resisted SalonQuest's discovery requests, and SalonQuest filed a motion to compel. The trial court held a hearing on the motion and, after considering the evidence presented and the parties' trial briefing on the issue, granted SalonQuest's motion to compel by order signed August 12, 2012, in which it ordered Rockafellow to disclose the requested information.

We are once again asked to determine whether Rockafellow has shown that the requested information is privileged as trade secret and, if so, whether SalonQuest has made a sufficient showing that it is nonetheless entitled to the information. See TEX. R. EVID. 507; In re Union Pac. R.R., 294 S.W.3d 589, 591 (Tex. 2009) (orig. proceeding) (per curiam). Based on our analysis of the evidence and application of the principles relating to trade secret privilege, we will again conditionally grant mandamus relief.

Background: The Diversion and Anti-Diversion Industries

It is helpful to outline our elementary understanding of the diversion industry and its offspring, the anti-diversion industry. Though SalonQuest has suggested that this case involves Rockafellow's immoral practice of interrupting the authorized or preferred distribution channel by tempting distributors or salons to provide him the products, it appears that the diversion industry is a highly developed, widely recognized, and multi-million-, perhaps multi-billion-, dollar industry. In other words, this is big business. And Rockafellow is not the only one involved in this business; he testified that there are ten or eleven major competitors in the diversion industry nationwide.

Diversion, as a business, seems to have come about in the climate of certain manufacturers' development of salon-only retail distribution policies in which the products would be sold to the consumer only through an authorized salon. When the product began showing up for sale on shelves of drug stores and grocery stores, however, it became clear that the product had been diverted outside the intended channel of distribution somewhere along the way. As this diversion industry grew, so did the anti-diversion industry in response, and a good amount of time and resources were devoted to trying to eliminate, reduce, or identify diversion. Some manufacturers and distributors have been more successful at this venture than others.

In a rather simplified model, as we understand it, diversion in the hair care products industry involves three primary players: manufacturer, distributor, and authorized retailer, typically a salon. From the authorized retailer, the product goes to the consumer. A diverter, like Rockafellow, interrupts this authorized distribution chain

4

somewhere along the channel, usually, it seems, between distributor and retailer or between retailer and consumer. The diverter then sells the product to an *unauthorized* retail outlet from which the consumer can purchase the product. Unless the diverter has found a supply through the manufacturer, the record before us suggests that the diverter's suppliers likely will be—or are somehow affiliated with—either authorized distributors or authorized retailers. Rockafellow testified that, of his five to seven suppliers of SalonQuest products, "some," but not all, of them are salons.

We also learn from the record that several tools have been developed to deter, eliminate, or identify diversion. In fact, it would appear that Patricia Urban, a private investigator who owns an anti-diversion consulting company in Ohio and who testified for SalonQuest at the hearing, has made a career of such efforts, having been involved in the industry since 1989 and having worked with SalonQuest since its inception in the late 1990s. Urban explained that there are contractual tools available to combat diversion. One of those tools is a non-diversion agreement, typically made between a distributor and an authorized retailer. In such agreements, the retailer agrees to certain non-diversion measures such as audits, reporting requirements, and restrictions on quantities to be sold. Typically, the manufacturer is named as a third-party beneficiary to these agreements and, in the example in the record before us, is expressly granted the right to enforce contractual provisions against the authorized retailer. From Urban's testimony, we understand that, in most instances, SalonQuest is a third-party beneficiary to the non-diversion agreements between a distributor and an authorized

retailer of SalonQuest products.[1] Urban identifies these non-diversion agreements as an "effective tool" in combating diversion.

We also learn of several available anti-diversion technologies developed in an attempt to prevent diversion or to identify the route through which diversion is occurring. Laser coding, UV coding, RFID tags, and other types of coding are used to track and identify products along the distribution channel. While all parties seem to agree that none of these higher technology tools is absolutely foolproof, there would appear to be an understanding that they can serve to provide a deterrent effect or, at least, provide the manufacturer or distributor with information regarding the sources of supply for the diversion industry.[2] SalonQuest does not employ any of these coding or tracking measures.

## Analysis

### Availability of Mandamus

Mandamus will issue only to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no other adequate remedy by law. Walker v. Packer, 827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding). Thus, evaluating whether

---

[1] She did explain that in a small percentage of cases, SalonQuest would have a non-diversion agreement directly with a salon. This was only done under certain circumstances and was the atypical arrangement.

[2] Rockafellow explained that the only guaranteed way to avoid diversion is for a company to sell a product that no one wants. Under-the-label coding seems to be the most effective anti-diversion measure that Rockafellow has encountered. He adds that RFID tags have been used effectively, too. Beyond those two methods, Rockafellow explained there are other measures but, as a diverter, he chose not to reveal those measures so as to not offer even more assistance to SalonQuest in its anti-diversion efforts.

mandamus relief should be granted requires that we determine whether there has been a clear abuse of discretion by the trial court and, if so, whether an adequate appellate remedy exists. See id.

In particular, a trial court abuses its discretion when it erroneously compels production of trade secrets without a showing that the information is "material and necessary." See In re Bass, 113 S.W.3d 735, 738, 743 (Tex. 2003) (orig. proceeding); see also Walker, 827 S.W.2d at 840 (concluding that "a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion, and may result in appellate reversal by extraordinary writ"). Further, the Texas Supreme Court has held that no adequate appellate remedy exists if a trial court orders a party to produce privileged trade secrets absent a showing of necessity. In re Bass, 113 S.W.3d at 745 (citing In re Cont'l Gen. Tire, Inc., 979 S.W.2d 609, 615 (Tex. 1998) (orig. proceeding)).

We will first address whether respondent abused his discretion by ordering that Rockafellow disclose the information at issue. That is, we must determine whether Rockafellow made the requisite showing that trade secret privilege applies to the information requested and then, if so, whether SalonQuest made an adequate showing that the information was necessary to fairly adjudicate its claims despite characterization of the information as trade secret.

Trade Secret Privilege Generally

The trade secret privilege is governed generally by Texas Rule of Evidence 507:

> A person has a privilege, which may be claimed by the person or the person's agent or employee, to refuse to disclose and to prevent other persons from disclosing a trade secret owned by the person, if the

7

allowance of the privilege will not tend to conceal fraud or otherwise work injustice. When disclosure is directed, the judge shall take such protective measure as the interests of the holder of the privilege and of the parties and the furtherance of justice may require.

TEX. R. EVID. 507. In the trial court, the party resisting discovery on the basis of the trade secret privilege must establish that the information is a trade secret. In re Cont'l Gen. Tire, 979 S.W.2d at 613. The burden then shifts to the requesting party to establish that the information is necessary for a fair adjudication of its claims. Id. If the requesting party meets this burden, the trial court should ordinarily compel disclosure of the information, subject to an appropriate protective order. Id. In each circumstance, the trial court must weigh the degree of the requesting party's need for the information with the potential harm of disclosure to the resisting party. Id. In other words, "[w]hen trade secret privilege is asserted as the basis for resisting production, the trial court must determine [1] whether the requested production constitutes a trade secret; [2] if so, the court must require the party seeking production to show reasonable necessity for the requested materials." In re Union Pac. R.R., 294 S.W.3d at 591 (quoting In re Bass, 113 S.W.3d at 738).

Is the information sought trade secret?

A trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." In re Bass, 113 S.W.3d at 739 (quoting Computer Assocs. Int'l. v. Altai, Inc., 918 S.W.2d 453, 455 (Tex. 1996)). Texas courts consider the following factors in determining whether the material at issue qualifies for the trade secret privilege: (1) the extent to which the information is known outside of his

8

business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. In re Union Pac. R.R., 294 S.W.3d at 592; In re Bass, 113 S.W.3d at 739. Because trade secret materials may not always "fit neatly into each factor every time" and because other factors may also be relevant depending on the circumstances of a particular case, we will weigh the factors in the context to determine whether the materials qualify as trade secret. In re Bass, 113 S.W.3d at 740.

In a situation factually similar to the instant case, our sister court weighed the factors of the balancing test to determine whether similar requested information was trade secret. See John Paul Mitchell Sys. v. Randalls Food Mkts., Inc., 17 S.W.3d 721, 726, 737–39 (Tex.App.—Austin 2000, pet. denied). Paul Mitchell involved the same general context at issue here: diversion of hair care products outside the manufacturer's preferred closed distribution chain. Id. at 726. In that case, Jade Drug Company sold Paul Mitchell products to Randalls grocery stores, which are non-salon locations and lie outside the preferred chain of distribution. Id. As was and did Rockafellow, Jade was called on to provide its list of suppliers and resisted on the basis of trade secret. Id. Jade established by affidavit that there was restricted access to its supplier list, it took time and money to develop the list, the list was valuable to the company, and the list was not readily obtained or duplicated. Id. at 738. The Austin court concluded that

9

Jade established that the list was "carefully compiled and closely guarded" and met its burden of showing that its supplier list was trade secret.  Id.

Here, by the affidavit also before us in the previous mandamus proceeding, Rockafellow explained that he has been in this business for twenty-five years and that it was "through substantial effort and expertise" that he developed his "vast network of industry contacts and sources."  He also stated that his contacts and suppliers are "not readily known to the public, and to a large extent, not readily known in the industry itself."  Rockafellow explained the confidential nature of his relationships with the suppliers and how MTBC's network of contacts and sources is the "most valuable part of its business" without which MTBC could not compete.  Rockafellow went on to explain that only he communicates with MTBC's suppliers and, apart from him, only the office manager and the warehouse manager have access to information that would enable them to determine the identities of MTBC's suppliers.  Both managers had been advised of the importance of keeping such information confidential.  Rockafellow's affidavit also described the ramifications of having to divulge suppliers' identities which, according to Rockafellow, would quickly culminate in MTBC going out of business.

In this proceeding, we also have a record of the hearing on the motion to compel. We now review that testimony, in addition to Rockafellow's affidavit, to determine whether the evidence still and again supports the conclusion that the information sought—here, the identities of MTBC's suppliers of SalonQuest products—is a trade secret.  See In re Union Pac. R.R., 294 S.W.3d at 592; In re Bass, 113 S.W.3d at 739.

*(1) the extent to which the information is known outside of his business*

Though diversion is a widely known concept in the hair care product business, Rockafellow testified that he has developed his own contact list over the course of twenty-six years and keeps that information to himself. Rockafellow has competitors and, although it appears that Rockafellow is a known diverter within the hair care products industry, his supply contacts are kept secret. Rockafellow testified that there are approximately ten or eleven major competitors in the diversion business nationwide. Again, they are widely known as diverters but their suppliers, too, are kept secret; he does not know the identities of his competitors' suppliers.

*(2) the extent to which it is known by employees and others involved in his business*

Rockafellow testified that only he, his office manager, and his warehouse manager have access to information regarding the identities of clients who supply hair care products to MTBC. He explained that, in the course of carrying on business, there will be other employees who may have partial information but not "the whole puzzle." That is, it appears that a few other people within the organization may have limited information regarding suppliers, but only Rockafellow does the negotiating and dealing with a supplier or a prospective supplier.

*(3) the extent of the measures taken by him to guard the secrecy of the information*

Rockafellow explained that only a limited supply of products will travel outside the intended closed channel of distribution and be available for diversion. So, supply is limited, and, according to Rockafellow's calculations, there are eleven or twelve major diversion businesses competing for that supply. Consequently, Rockafellow takes

measures to protect his limited supply of products: "Everything is kept pretty secret." In his ongoing efforts to keep most everything secret, names of companies, telephone numbers, bills of lading, and such are all kept "close to our vest." As Rockafellow explains, diversion, by its nature, means not revealing your supply contacts.

Nothing leaves the MTBC office unless the law requires that it must, and all pertinent information is kept under lock and key. Rockafellow described his electronic security system which unlocks the doors at 8:00 a.m. and sounds an alert when anyone enters the building. The main entrance is composed of glass, too, so as to facilitate identification of all those coming and going. At 5:00 p.m., the security system locks the doors, and a person wishing to gain entrance must knock and receive permission to enter the building. He adds that this system protects the company's information but also provides added security for employees' safety. Officer workers are kept to the minimum necessary to carry on business, and those employees cannot make copies without permission. Rockafellow includes the cost of this very litigation as another expense and another measure in guarding the secrecy of his contacts.

*(4) the value of the information to him and to his competitors*

Rockafellow explained that people in the diversion industry know one another but do not know from whom one another is buying supply. He does not know his competitors' suppliers. Supply is vital to his business and, therefore, the identities of those who supply the products for diversion is, likewise, vital. He explained that, if his competitors were to obtain the identity of his suppliers, the competitors could outbid him for the supply. In that event, the outcome is "simple": he would eventually have nothing

to sell and would go out of business. Though we cannot arrive at a dollar amount that the information would be worth to a potential competitor, we do learn from the record that MTBC generated $45 million in total sales for the year 2011, which would lend itself to the conclusion that the information at issue could be very valuable indeed.[3]

*(5) the amount of effort or money expended by him in developing the information*

We learn that Rockafellow has spent twenty-six years developing relationships with suppliers. We do not know what resources he has spent in developing those relationships, but he does point out that he has expended money in protecting it. Rockafellow explains that MTBC's growing success is due in large part to the fact that he is "known as someone who doesn't give up his sources." Indeed, he cites litigation costs in resisting disclosure as an expenditure in furtherance of protecting his client list.

*(6) the ease or difficulty of properly acquiring or duplicating information*

It is difficult to determine the ease with which others could acquire or duplicate the information, given that much of the dealings seem to rest on the reputations and prior dealings with the diverter. As Rockafellow explains, he has developed his suppliers' list over the course of a quarter of a century, and he attributes his longevity in the business to his reputation for protecting the identities of his supply sources.[4]

---

[3] We note that the total sales figure does include non-SalonQuest products but emphasize, nonetheless, that the information at issue is valuable to MTBC and would likely prove valuable to its competitors.

[4] In its response to Rockafellow's petition, SalonQuest points to a number of what it considers inconsistencies between Rockafellow's affidavit and his testimony in support of its assertion that Rockafellow's claim of trade secret are of "dubious credibility." SalonQuest characterizes these inconsistencies as factual disputes which

Acknowledging SalonQuest's point that Paul Mitchell stands in a different procedural posture than does the instant case, we remain persuaded by our sister court's application of the relevant factors to a similarly situated party in a similar business context. See Paul Mitchell, 17 S.W.3d at 738. With that, we still see no compelling distinction between the examination of relevant facts by our sister court in Paul Mitchell and still find its application of the balancing test in this context persuasive.[5] See id. In light of the relevant factors, we conclude that Rockafellow showed that access to the information sought is strictly limited and is not readily accessible, the information sought is highly valuable to MTBC, and the information sought is the

would defeat Rockfellow's request for mandamus relief. Without addressing each of SalonQuest's examples, we note that we have evaluated the cited statements and consider them more accurately characterized as elaboration or clarification in response to specific questions on that particular subject.

[5] Despite the primarily procedural distinctions between Paul Mitchell and the instant case, we point out that the Austin court of appeals specifically addressed the issue before us: "We now turn to the particular facts of this case to determine if the trial court abused its discretion in refusing to compel discovery of Jade's list of suppliers." Id. at 738. After analyzing the factors relevant to the application of the trade secret privilege, the Paul Mitchell court ultimately concluded that "Jade met its burden of establishing trade secret protection for its list of suppliers." Id. SalonQuest maintains that because no breach of contract claims against Jade's suppliers were pending in that case, the degree of necessity in Paul Mitchell was obviously distinguishable from the case at bar. In other words, SalonQuest claims that it has a greater need for the information than Paul Mitchell did in that case because SalonQuest, unlike Paul Mitchell, has breach of contract claims pending in the underlying case. We acknowledge this procedural distinction, but note, in response, that the fact that SalonQuest does have pending breach of contract claims against as-yet unidentified defendants has no bearing on the first step in our analysis. That is, the Austin court's well-developed analysis of the application of the trade secret privilege–which relates solely to the resisting party's burden–remains persuasive in our consideration of that same first step in the analysis. Likewise, for purposes of analyzing this first step, we are not at all persuaded by one of SalonQuest's proposed factual distinctions, that one being the fact that Paul Mitchell used UV coding and therefore could have discovered the information by reviewing data gained from such coding. In fact, as we will discuss, that distinction may very well come to weigh against SalonQuest in its efforts to make an adequate showing of necessity.

product of a great deal of time and effort on Rockafellow's part and is not easily accessible or duplicated.  See id.; see also In re Union Pac. R.R., 294 S.W.3d at 592. We conclude that Rockafellow carried his burden of showing that the supplier list and information related to the identities of MTBC's suppliers are trade secret.  In doing so, he successfully shifted the burden to SalonQuest to establish that such information was necessary for a fair adjudication of its claims.

Is the Information Necessary for or Essential to Fair Adjudication?

We now address the second prong of the test in which we must determine if discovery of this trade secret material is "necessary for a fair adjudication" of SalonQuest's claims.  See In re Cont'l Gen. Tire, 979 S.W.2d at 613.  Necessity depends on whether the trade secret's production is "necessary or essential to the fair adjudication of the case."  In re Union Pac. R.R., 294 S.W.3d at 592.  The Texas Supreme Court has acknowledged that it has not "state[d] conclusively what would or would not be considered necessary for a fair adjudication, indicating instead that the application of the test would depend on the circumstances presented."  Id. (quoting In re Bridgestone/Firestone, Inc., 106 S.W.3d 730, 732 (Tex. 2003) (orig. proceeding)).  We are directed to consider "the nature of information and the context of the case."  Id. With this in mind, we revisit the general principles from cases on this subject.

It is not an adequate showing of necessity when the requesting party makes general assertions of unfairness.[6]  In re Union Pac. R.R., 294 S.W.3d at 592–93; see In

---

[6] So, SalonQuest's assertions which highlight the "shady" nature of the diversion industry are inadequate to satisfy its burden of showing that the requested information is necessary to the fair adjudication of its claims.

15

re Bridgestone/Firestone, 106 S.W.3d at 734 (concluding that "[t]he mere possibility of unfairness is not enough to warrant disclosure" of trade secret). Further, there are cases which suggest that we must also consider the availability of other means of acquiring the requested information. See In re Cont'l Gen. Tire, 979 S.W.2d at 615 (adopting rule, pre-dating Texas Rule of Evidence 507, from Automatic Drilling Machs., Inc. v. Miller, 515 S.W.2d 256, 259 (Tex. 1974) (orig. proceeding), which considers availability from other sources in determining whether disclosure of trade secret is warranted); In re XTO Res. I, LP, 248 S.W.3d 898, 904–05 (Tex.App.—Fort Worth 2008, orig. proceeding) (concluding that requesting party failed to adequately show necessity when the record revealed that, among other shortcomings, documents "containing at least some of the [requested] underlying data were available from other sources"). The Texas Supreme Court explained this "guiding principle[]":

> [T]rade secret information is generally discoverable when not allowing discovery would significantly impair a party's ability to establish or rebut a material element of a claim or defense. A party's ability is significantly impaired when the information is unavailable from any other source and no adequate alternative means of proof exist.

In re Bridgestone/Firestone, 106 S.W.3d at 736 (O'Neill, J. concurring). Indeed, the requesting party who bears the burden of showing necessity of trade secret information must demonstrate "with specificity exactly how the lack of the information will impair the presentation of the case on the merits to the point that an unjust result is a real, rather than a merely possible, threat." Id. at 733 (majority opinion). So, it would appear that the burden which has shifted to SalonQuest is a fairly heavy one.

Keeping in mind that our evaluation of SalonQuest's "necessity" burden depends on the nature of the information and the context of the case, we now turn to the

evidence SalonQuest has presented in support of its position that the requested trade secret information is "necessary or essential for a fair adjudication of [its] claims." See id. at 731. SalonQuest explains generally that it "needs the information both for the breach of contract claims asserted against the Jane Doe defendants as well as the tortious interference claim and civil conspiracy claims asserted against Rockafellow." But, again, the issue becomes whether SalonQuest has demonstrated "with specificity exactly how the lack of the information will impair the presentation of the case on the merits to the point that an unjust result is a real, rather than a merely possible, threat." See id. at 733.

An assessment of this issue on these facts will call for an evaluation of what SalonQuest has and has not done to otherwise discover the points at which diversion has occurred along its distribution route. That is, we must look to determine whether SalonQuest has established that not forcing Rockafellow to provide the identities of his suppliers will pose a real threat—rather than a mere possibility—of an unjust result. Id. And, here, when we cannot be confident from the record that SalonQuest is unable to find out the requested information through any of a number of other available methods for tracking or deterring diversion, we cannot conclude that SalonQuest has carried its burden of showing such a threat.

The record reveals a number of available means of combating diversion, both technological and contractual tools. The record also reveals that SalonQuest has not fully employed many of those methods. With respect to high technology methods of tracking and identifying diversion, SalonQuest considered, explored, but, ultimately, rejected certain coding technology as too expensive. So, SalonQuest has, for business

17

reasons, opted not to employ technologically advanced methods of tracking its product along the distribution channel. In defense of SalonQuest's failure to use such methods to detect deviations from the preferred distribution channel, its witness on anti-diversion measures, Urban, testified to the following:

> I can tell you in general terms that SalonQuest is a much smaller company than most of these manufacturers that employ the high technology. We know that it is an important tool. We continue to look at what we can do cost effectively to enhance our ability. And frankly up until about two years ago, and particularly with this HEB problem, we were doing a pretty darn good job of controlling diversion using all of the other tools. It is apparent that we need to continue to enhance because as much as we have tried, we can't. We have not been able to stem the source -- identify and stop the source of this diverted product.

SalonQuest evidently undertook a cost-benefit analysis to arrive at its decision not to use the advanced measures available for combating and identifying diversion. That may, in fact, be a sound business decision, but that does not excuse SalonQuest in this context from having to make a showing that it attempted to identify the suppliers from within its own intended chain of distribution before it attempts to defeat Rockafellow's trade secret privilege. SalonQuest's exercise of sound business judgment does not mean that it can, then, simply resort to Rule 507 to gain access to the information from Rockafellow when SalonQuest has, by its own admission, decided not to utilize other available means of seeking out that information. SalonQuest cannot ask the courts to use Rule 507 to eliminate or alleviate the risk of not using alternative—albeit more expensive—means of obtaining the requested information.

SalonQuest has emphasized that these tracking and coding technologies are not foolproof, and they may well be correct on that point, too. While it may be true that these advanced tracking and coding methods would not yield the information which

SalonQuest seeks, the decision not to employ such means, again, is a business decision, the risks of which should be borne by SalonQuest and not visited on Rockafellow or the courts. Further, the possibility that, even with advanced means of tracking, SalonQuest may not find what it seeks should not relieve them of the duty of looking.

Moreover, it appears that, through agreements between its distributors and its authorized retailers, SalonQuest retains some amount of power to compel audits of retailer's accounts. These agreements designate SalonQuest as a third-party beneficiary and specifically grant SalonQuest the power to enforce the contract provisions against the salon. So, it appears that SalonQuest could request audits either in the cooperative spirit it maintains with its distributors or directly against the salons by way of its rights as third-party beneficiary. The record suggests, however, that SalonQuest has concentrated its efforts in reviewing data from one of its major distributors and only with respect to one type of link on the distribution chain. Urban explained the steps she took to identify MTBC's suppliers:

> I look at salon purchases. I look at distributor purchases. I interact with the diversion control department at BSG corporate headquarters. I talk to sales consultants. I talk to SalonQuest field reps. We have people out in the field to go out and check salons to see product there. We utilize all of the avenues that are available to us to try to determine where the leaks are and to stop them wherever they may be occurring.

Urban added that she "work[ed] closely with the diversion control department" of one of its large distributors in investigating instances of diversion. She explained that she asked the distributor's "diversion control person" to work with Urban and SalonQuest to review salon accounts, and personally reviewed sales reports from the distributor for

"potentially questionable purchasing patterns" by salons. From her testimony on the measures employed to find out on its own the information requested, it appears that the measures were limited largely to data from the distributor. Nothing in the record suggests that SalonQuest exercised what seems to be its right to inspect authorized salon's sales data. In other words, it appears that SalonQuest has sought assistance from one of its larger distributors and enlisted its assistance in routing out the diverting salons, but there is no evidence to suggest that SalonQuest has utilized the full spectrum of anti-diversion investigatory tools that are available through its contractual rights as third-party beneficiary to the distributor-salon non-diversion agreements.

We remind the parties that we are directed to examine each case on its own circumstances. See In re Union Pac. R.R., 294 S.W.3d at 592. We have considered the nature of information at issue here and the context in which it was developed and is sought. See In re Bridgestone/Firestone, 106 S.W.3d at 732. With that in mind and understanding that the availability of the requested information through other sources is not a dispositive consideration, we observe that availability is, likewise, not one which we can overlook in this context considering the nature of the information at issue. Cf. In re West Tex. Positron, Ltd., No. 07-04-00506-CV, 2005 Tex. App. LEXIS 496, at *13–15 (Tex.App.—Amarillo Jan. 20 2005, orig. proceeding) (mem. op.) (considering availability of requested information in concluding that requesting party demonstrated requisite need for information and denying mandamus relief).[7] In this context, the potential harm

---

[7] Of course, availability from other sources is a consideration which can weigh in favor of either party as illustrated by our opinion in West Texas Positron, in which we observed that the requesting party had shown that the requested information was "not ascertainable elsewhere" and "could be obtained from only two sources, those being the partnership's records . . . and the customers themselves, and the customers were

of disclosure outweighs the degree of the requesting party's need for the trade secret information.  See In re Cont'l Gen. Tire, 979 S.W.2d at 613.

Here, in light of evidence that SalonQuest *could* procure the information from other sources or through alternative avenues which it has yet to adequately explore, we conclude that it has failed to make an adequate showing that compelling disclosure of trade secret information was necessary for a fair adjudication of its claims.  See In re Union Pac. R.R., 294 S.W.3d at 592.

Rule 507 and Fraud or Injustice

Rule 507 permits the application of the trade secret privilege "if allowance of the privilege will not tend to conceal fraud or otherwise work injustice."  See TEX. R. EVID. 507.  Both at the trial court and before this Court, SalonQuest has vigorously advanced the position that diversion is "a shady business" and is not worthy of trade secret protection.  In doing so, it seems to be asking the Court to declare the diversion industry in its entirety an injustice or fraud.[8]  But the seemliness and fate of the diversion business are issues which belong more appropriately to the industry and marketplace forces.  The courts are not in the business of deterring diversion, nor can we endorse

_____

subject to confidentiality agreements in their contracts with the partnership."  See id. at *15.  On those facts, the requesting party had shown that the requested information was "necessary to [her] ability to pursue judicial determination of the value of her partnership interest."  Id. at *14.

[8] In fact, it could be understood that the "fraud-or-injustice" portion of Rule 507 served as the thrust of SalonQuest's contention.  SalonQuest's attorney remarked to the trial court at the opening of the hearing that "the key question for this Court is the second part of Rule 507, which says it should still be allowed if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice."

the practice of resorting to Rule 507 as an alternative marketplace tool for investigating it when other investigatory means exist but have not been utilized.

<u>Summary</u>

In summary, Rockafellow met his burden of showing MTBC's list of suppliers was trade secret and, thereby, shifted the burden to SalonQuest to show that disclosure of the information was necessary for a fair adjudication of its claims. SalonQuest failed to make such a showing. It did show that disclosure through Rockafellow would likely be more convenient and probably more accurate but, in this instance, it is not *necessary* for a fair adjudication of SalonQuest's claims that Rockafellow be required to disclose the trade secret information. Therefore, the trial court abused its discretion when it authorized the deposition of Rockafellow and compelled disclosure of trade secret information without an adequate showing by SalonQuest that such information was necessary for a fair adjudication of its claims. See <u>In re Bass</u>, 113 S.W.3d at 738, 743.

Conclusion

Having concluded that the information in question was trade secret and not discoverable as privileged information pursuant to Rule 507 in the absence of an adequate showing of necessity, which SalonQuest has failed to make, we conclude that Rockafellow has shown he is entitled to mandamus relief as requested. Accordingly, we conditionally grant the petition for writ of mandamus and direct the respondent to vacate its order dated August 7, 2012, in which it ordered the disclosure of documents concerning the identities of MTBC's suppliers of SalonQuest products. Because we are confident the respondent will comply with this directive, the writ will issue only if the

22

respondent fails to do so.  Our disposition of this case serves to lift the stay previously imposed by the Court.  <u>See</u> TEX. R. APP. P. 52.10(b).

                                    Mackey K. Hancock
                                         Justice

Quinn, C.J., dissenting.